# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 25, 2022          Decided July 26, 2022

No. 20-1370

ADVOCATES FOR HIGHWAY AND AUTO SAFETY, ET AL.,
PETITIONERS

v.

FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION, ET AL.,
RESPONDENTS

OWNER-OPERATOR INDEPENDENT DRIVERS ASSN., INC.,
INTERVENOR

On Petition for Review of a Final Rule of the
Federal Motor Carrier Safety Administration

*Adina H. Rosenbaum* argued the cause for petitioners. With her on the briefs was *Scott L. Nelson.*

*Brian J. Springer*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Abby C. Wright*, Attorney, *John E. Putnam*, Deputy General Counsel, U.S. Department of Transportation, *Paul M. Geier*, Assistant General Counsel for Litigation and Enforcement, and *Peter J. Plocki*, Deputy Assistant General Counsel for Litigation and Enforcement.

*Paul D. Cullen, Jr.* argued the cause for intervenor Owner-Operator Independent Drivers Association, Inc. in support of respondents.   With him on the brief was *Charles R. Stinson*.

Before:   ROGERS, MILLETT, and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*:   In 2020, the Federal Motor Carrier Safety Administration modified its regulations governing the maximum hours that commercial motor vehicle operators may drive or operate within a certain timeframe. Hours of Service of Drivers, 85 Fed. Reg. 33,396 (June 1, 2020) ("Final Rule").   The International Brotherhood of Teamsters, a labor union representing commercial truck drivers, and three national nonprofit organizations petitioned for review.   They argue that the Final Rule was arbitrary and capricious for failing to grapple with the safety and driver-health consequences of changes to recordkeeping rules for short-haul commercial vehicle drivers and break requirements for long-haul drivers.

Because the modifications to the hours-of-service rules were sufficiently explained and grounded in the administrative record, we deny the petition.

**I**

For almost a century, the federal government has regulated the work hours of commercial truck drivers and operators of other commercial motor vehicles.   *See* 49 U.S.C. § 31132(1) (defining "commercial motor vehicle"); 49 C.F.R. § 350.105 (same).   One such limitation is a cap on the time that such

drivers can work or drive within a particular time frame. Hours-of-service rules also often limit the distance that can be driven during those time periods and impose recordkeeping requirements to enforce compliance.

The Federal Motor Carrier Safety Administration ("Administration") is the agency currently charged with regulating the safe operation of commercial vehicles. [1] Congress established the Administration in 1999 because the "rate, number, and severity of crashes involving motor carriers in the United States [were] unacceptable." Motor Carrier Safety Improvement Act of 1999, Pub. L. No. 106-159, § 3(1), 113 Stat. 1748, 1749. Because of that safety concern, Congress charged the Administration with making the "maintenance of safety * * * the highest priority" in its regulatory decisionmaking, "recognizing the clear intent, encouragement, and dedication of Congress to the furtherance of the highest degree of safety in motor carrier transportation." 49 U.S.C. § 113(b). At the same time, before promulgating regulations, the Administration must consider the "costs and benefits" of its proposals "to the extent practicable and consistent with the purposes of" federal legislation on commercial motor vehicle safety. 49 U.S.C. § 31136(c)(2), (c)(2)(A); *see* Motor Carrier Safety Act of 1984, Pub. L. No. 98-554, §§ 201, 206, 98 Stat. 2832, 2834.

The Administration is tasked with promulgating regulations that "[a]t a minimum" ensure that:

---

[1] This authority previously lay with the Interstate Commerce Commission, and then the Federal Highway Administration. *See* ICC Termination Act of 1995, Pub. L. No. 104-88, § 408, 109 Stat. 803, 958; *Owner-Operator Indep. Drivers Ass'n v. Federal Motor Carrier Safety Admin.*, 494 F.3d 188, 193 (D.C. Cir. 2007).

(1) commercial motor vehicles are maintained, equipped, loaded, and operated safely;

(2) the responsibilities imposed on operators of commercial motor vehicles do not impair their ability to operate the vehicles safely;

(3) the physical condition of operators of commercial motor vehicles is adequate to enable them to operate the vehicles safely and the periodic physical examinations required of such operators are performed by [qualified] medical examiners * * *;

(4) the operation of commercial motor vehicles does not have a deleterious effect on the physical condition of the operators; and

(5) an operator of a commercial motor vehicle is not coerced by a motor carrier, shipper, receiver, or transportation intermediary to operate a commercial motor vehicle in violation of a regulation * * *.

49 U.S.C. § 31136(a).

## A

The Administration continues to rely on hours-of-service limitations as a linchpin regulatory measure to ensure the safe operation of commercial motor vehicles. Two of those regulations are at issue here: a special recordkeeping exemption for short-haul drivers, 49 C.F.R. § 395.1(e)(1), and the requirement that long-haul drivers take a 30-minute break at set intervals, 49 C.F.R. § 395.3(a)(3)(ii).

**1**

Federal hours-of-service restrictions have a long regulatory history that bears on the issues before us.

The Interstate Commerce Commission implemented the first hours-of-service regulation in 1938. *See* Order in the Matter of Maximum Hours of Service of Motor Carrier Employees, 3 Fed. Reg. 9 (Jan. 4, 1938). From their inception, limiting (i) the total working hours per day ("on-duty time"), (ii) drivers' time behind the wheel, and (iii) weekly hours worked has been the core of hours-of-service regulations.

The original rule set a maximum of 60 hours of "on duty" time in any week, and generally no more than 15 hours in any 24-hour period. 3 Fed. Reg. at 9. Within those 15 hours of on-duty time, the rule, as amended, did not permit "driv[ing] or operat[ing] a motor vehicle for more than 10 hours" in a 24-hour period, unless the driver was "off duty for 8 consecutive hours during or immediately following" the 10-hour driving period. Order in the Matter of Maximum Hours of Service of Motor Carrier Employees, 3 Fed. Reg. 1875, 1876 (July 28, 1938); *see also* 49 C.F.R. part 191 (Supp. 1938). Under the regulation, drivers were considered to be "on duty" from the time they began work or were required to be in readiness to work until the time they were relieved from all work responsibilities. *Id.* Time in a truck's sleeping berth did not count as on-duty time. *Id.*

The hours-of-service rules imposed recordkeeping requirements on drivers, including that they keep a detailed daily log documenting, among other things, both their on-duty hours and time behind the wheel. 3 Fed. Reg. at 9; *see also* Qualifications and Maximum Hours of Service of Employees

of Motor Carriers and Safety of Operation and Equipment, 27 Fed. Reg. 3553, 3554 (April 13, 1962).

In 1962, the Interstate Commerce Commission created an exemption from the driver-log recordkeeping requirements for short-haul drivers.  27 Fed. Reg. at 3554.  At that time, a short-haul driver was "any regularly employed driver who drives wholly within a radius of fifty miles of the garage or terminal at which he reports for work[.]"  *Id.*  But short-haul drivers still had to maintain "records showing the total number of hours the driver is on duty per day and the time at which the driver reports for and is released from duty each day[.]"  *Id.*

The Commission later expanded the short-haul driver exemption to a 100-mile radius.  *See* Hours of Service of Drivers; 100-Mile Exemption—Driver's Logs, 45 Fed. Reg. 22,042, 22,043 (April 3, 1980).  At the same time, the rule imposed a 12-hour limit for on-duty hours so that the short-haul exemption would apply only if the driver returned to the place where he or she reported to work within 12 hours.  *Id.*

The Commission justified expanding the short-haul exemption, in part because it perceived "no difference between enforcing the hours of service regulations with a 50-mile radius exemption * * * and enforcing the regulations with a 100-mile radius exemption[.]"  45 Fed. Reg. at 22,043.  The Commission, though, maintained the 12-hour limitation because "[t]he requirement that the motor carrier prepare and retain true and accurate time records, coupled with the 12-hour [on duty] limitation, ensures that adequate records are available to determine driver compliance with the hours of service regulations."  *Id.*

In 1995, Congress separately mandated regulations "dealing with a variety of fatigue-related issues pertaining to

commercial motor vehicle * * * safety[.]" 49 U.S.C. § 31136 note (citation omitted); *see Owner-Operator Indep. Drivers Ass'n v. Federal Motor Carrier Safety Admin.*, 494 F.3d 188, 194 (D.C. Cir. 2007). Having recently assumed regulatory jurisdiction, the Administration promulgated a rule for property-carrying commercial motor vehicles that "increase[d] required time off duty from 8 to 10 consecutive hours; prohibit[ed] driving after the end of the 14th hour after the driver began work; [and] allow[ed] an increase in driving time from 10 to 11 hours[.]" Hours of Service of Drivers; Driver Rest and Sleep for Safe Operations, 68 Fed. Reg. 22,456, 22,457 (April 28, 2003); *see id.* at 22,501. The new rule allowed short-haul drivers to drive up to 16 hours one day a week. *Id.* at 22,471.

This court vacated the 2003 rule in its entirety because "the agency failed to consider the impact of the rule[] on the health of drivers, a factor the agency must consider under its organic statute." *Public Citizen v. Federal Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004).

**2**

The Administration issued a new rule in 2005 that required all drivers of property-carrying commercial motor vehicles to take a minimum of 10 consecutive hours off duty, "limit[ed] [their] driving time to 11 consecutive hours within a 14-hour, non-extendable window after coming on duty, and prohibit[ed] driving after the driver has been on duty 60 hours in 7 consecutive days, or 70 hours in 8 consecutive days." Hours of Service of Drivers, 70 Fed. Reg. 49,978, 49,980 (Aug. 25, 2005) ("2005 Rule").

The 2005 Rule also created a new type of short-haul exemption specifically for drivers of property-carrying

commercial motor vehicles that do not require a commercial driver's license. 70 Fed. Reg. at 49,980 (codified at 49 C.F.R. § 395.1(e)(2)). As long as those drivers "operate within a 150-mile radius of their work-reporting location[,]" the rule exempted them from "keep[ing] logbooks" and allowed them to "use a 16-hour driving window twice a week." *Id.* In other words, driving time was still restricted to "the normal 11 hours," but while complying with that time restriction, these drivers could work a 14-hour on-duty period five days a week and an even longer 16-hour day twice a week if needed "to meet unusual scheduling demands[,]" all while retaining their recordkeeping exemption. *Id.*; *see id.* at 50,071.

This court vacated portions of the 2005 Rule, including the increase in the daily driving limit to 11 hours, for failure to allow sufficient public comment and because of the agency's insufficient explanation of key aspects of its analysis. *Owner-Operator Indep. Drivers Ass'n*, 494 F.3d at 193.

The agency promulgated a very similar rule in 2011 that again increased the daily driving limit to 11 hours. Hours of Service of Drivers, 76 Fed. Reg. 81,134 (Dec. 27, 2011) ("2011 Rule"). But the rule also prohibited driving unless the operator had taken a break from all work of at least 30 minutes within the previous 8 hours. *Id.* at 81,134. This new provision "imposed the requirement of a 30–minute off-duty break on *both* long-haul and short-haul truckers." *American Trucking Ass'ns v. Federal Motor Carrier Safety Admin.*, 724 F.3d 243, 252 (D.C. Cir. 2013).

This court sustained most of the 2011 Rule but vacated the 30-minute break requirement for short-haul drivers. *American Trucking Ass'ns*, 724 F.3d at 254. We explained that, "[d]espite the many paragraphs scattered throughout the multiple rulemakings distinguishing short- and long-haul

trucking[,]" the 2011 Rule contained "not one word justifying the agency's decision to apply the new requirement to the unique context of short-haul operations." *Id.* at 253. That said, we concluded that the agency had "more than adequately supported its choice" to apply the rule to long-haul drivers with its finding that "'off-duty' breaks provided the 'greatest benefit'" to safety. *Id.* (citation omitted).

In 2012, Congress mandated that the Administration promulgate a rule requiring that all commercial motor vehicle drivers "subject to the hours of service and the record of duty status requirements" use "electronic logging device[s] to improve compliance * * * with hours of service regulations[.]" Moving Ahead for Progress in the 21st Century Act, Pub. L. No. 112-141, § 32301, 126 Stat. 405, 786–787 (2012) (codified at 49 U.S.C. § 31137(a)). The Administration issued that rule in 2015. *See* Electronic Logging Devices and Hours of Service Supporting Documents, 80 Fed. Reg. 78,292 (Dec. 16, 2015). The electronic logging device requirement was not applied to short-haul drivers. *Id.* at 78,294.

**B**

In 2020, the Administration modified the hours-of-service regulation by promulgating the Final Rule at issue in this case. 85 Fed. Reg. at 33,396. As relevant here, the agency expanded its short-haul exemption for drivers that operate vehicles requiring a commercial driver's license, 49 C.F.R. § 395.1(e)(1), and it modified its 30-minute break requirement for long-haul drivers of property-carrying commercial motor vehicles, *id.* § 395.3(a)(3)(ii).

The Final Rule expanded the short-haul recordkeeping exemption in two ways. First, it "extend[ed] the maximum duty period allowed under the short-haul exception * * * from

12 hours to 14 hours." 85 Fed. Reg. at 33,396. Second, it "extend[ed] the maximum radius in which the short-haul exception applies from 100 to 150" miles. *Id.* As a result, more drivers can take advantage of the simplified recordkeeping requirements of the short-haul exemption, need not use electronic logging devices, and are exempted from the 30-minute break requirement that applies to long-haul drivers.

The Administration also narrowed the 30-minute break requirement. 85 Fed. Reg. at 33,396. Under the Final Rule, the required break only applies if "a driver has *driven*"—instead of having worked—for 8 hours without "at least a 30-minute *non-driving*" interval. *Id.* (emphases added). The break can now be "satisfied by any non-driving period of 30 minutes," including time spent doing job-required physical labor like loading and unloading the vehicle. *Id.*

The Final Rule highlighted the increased flexibility for drivers and motor carriers provided by these modifications and the cost savings associated with them. *See, e.g.*, 85 Fed. Reg. at 33,397, 33,405, 33,407. In addition, the Administration predicted that the changes would enable companies to better meet existing and future market demand. *Id.* at 33,405–33,406, 33,409. The Administration also concluded that there would be no adverse impact on collision risk, driver health, or compliance with hours-of-service regulations. *Id.* at 33,403, 33,406–33,407, 33,409–33,410, 33,446–33,447.

The Advocates for Highway and Auto Safety, the International Brotherhood of Teamsters, Citizens for Reliable and Safe Highways, and Parents Against Tired Truckers (collectively, "Highway Advocates") timely petitioned for review, arguing that the Administration (i) failed to adequately explain its conclusion that the new short-haul exemption was safety neutral with respect to collision risk and driver health

and would not negatively impact regulatory compliance; and (ii) insufficiently explained how the modification to the 30-minute break requirement was safety neutral and would not impact driver health.

## II

This court has statutory jurisdiction under 28 U.S.C. § 2342(3)(A). The Administration challenges the court's Article III jurisdiction because, in its view, the Highway Advocates lack constitutional standing. We disagree.

An association has standing to bring suit on behalf of its members if "(1) at least one of its members would have standing to sue in [the member's] own right; (2) the interest [the association] seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit." *American Trucking Ass'ns*, 724 F.3d at 247 (citation omitted). When petitioning for direct review of agency action, a petitioner's burden to establish standing is the same as a plaintiff moving for summary judgment. *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002). That means a petitioner must support each of the standing elements "by affidavit or other evidence[.]" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). When multiple petitioners seek common relief, we have jurisdiction as long as one of the petitioners has standing. *See Americans for Safe Access v. Drug Enforcement Admin.*, 706 F.3d 438, 443 (D.C. Cir. 2013).

The International Brotherhood of Teamsters has adequately demonstrated associational standing because it has shown that at least one of its members is directly regulated by the rule and has been injured by it. The Teamsters submitted in the administrative record a "survey of affected Teamster

membership regarding [the Administration's] proposed changes[.]" Joint Appendix ("J.A.") 182. The survey shows that some of the Teamsters' members "currently qualify for the short-haul exception" and "will likely be assigned work that will either increase [vehicle miles traveled] or be required to perform more non-driving tasks that extend the workday to 14 hours." J.A. 185. One individual complained that the current 12-hour workday for short-haul drivers was "more than enough" and that a 14-hour duty period would deprive him of a "family-sustaining lifestyle[.]" J.A. 185.

Other Teamsters members subject to the new 30-minute break requirement "overwhelmingly indicated" that losing the 30-minute break requirement would increase their "fatigue[.]" J.A. 189. In their view, carriers would likely "discipline" them for taking "unscheduled breaks" when fatigued and would "pressure [them] to increase productivity by requiring [them] to perform additional on-duty/ non-driving tasks." J.A. 189.

The survey responses from specific, individual Teamsters members demonstrate that those members are the "object of the [regulatory] action * * * at issue" and will be harmed by the new rule's operation, primarily by losing the work-hour protections the previous rule provided. *Sierra Club*, 292 F.3d at 900 (citation omitted). In particular, the members have lost the beneficial limitations on their working hours, caps on driving distances, and mandates for off-duty rest periods. As a result, there is "little question that the [agency's] action * * * has caused [them] injury, and that a judgment [in their favor] will redress it." *Id.* at 900 (citation omitted); *see Bonacci v. Transportation Sec. Admin.*, 909 F.3d 1155, 1160 (D.C. Cir. 2018) (airline pilot "plainly ha[d] standing" to challenge Transportation Security Administration rule subjecting pilots

to advanced screening requirements); *see also* Byrd Declaration ¶ 2, Highway Advocates Opening Br. Add. B 1.

Likewise, survey responses sufficiently identify specific members injured by the modifications to the 30-minute break requirement. Responses from individuals subject to the long-haul regulations who had previously had the benefit of an off-duty 30-minute break asserted that the current break was "necessary to reduce fatigue[.]" J.A. 189. Some respondents also did not want to be "pressure[d]" to "perform additional on-duty/ non-driving tasks" during their 30-minute break. J.A. 189. In that way, the record contains evidence that individual members of the Teamsters, who are regulated by the 30-minute provision, do not want to lose the protections provided by the 30-minute off-duty break and will experience increased fatigue without a break.

In the Administration's view, the Teamsters' survey responses are insufficient because "[n]o individual driver * * * filed an affidavit[,]" and so the Highway Advocates have failed to "specifically identify members who have suffered the requisite harm," Gov't Br. 26 (quoting *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011)). The Administration is incorrect on both fronts.

First, the lack of an affidavit is not fatal to the Teamsters' standing because a petitioner may also support standing with evidence in the administrative record. *See Sierra Club*, 292 F.3d at 900. Though it may be advisable to submit an affidavit if standing could be questioned, a petitioner is only required to provide an affidavit when its standing is not "apparent from the administrative record[.]" *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019) (quoting D.C. Cɪʀ. R. 28(a)(7)). Here, the record establishes the Teamsters' standing. The record documents that the

Teamsters' membership includes short-haul and long-haul drivers, *see* J.A. 182, who have standing in their own right because they are directly regulated by the Final Rule, *see* J.A. 185, 189; *accord* Byrd Declaration ¶ 2. So here, "no evidence outside the administrative record is necessary for the court to be sure of [standing]." *Sierra Club*, 292 F.3d at 900.

Second, the Administration is also incorrect that the Teamsters have failed to identify individual members who meet the standing criteria. To be sure, it is not enough to merely "aver that unidentified members have been injured." *Chamber of Com.*, 642 F.3d at 199. But here we do not need to "speculat[e]" whether "one individual will meet all of the[] [standing] criteria[.]" *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). The Teamsters submitted survey responses with direct quotations from individual members affected by the proposed changes to the short-haul requirement. *See* J.A. 185. One individual decried the expanded short-haul exemption stating that "[f]ive days per week at 12 hours per day is more than enough, let alone 5 days at 14 hours per shift. * * * [T]his proposal needs to go away." J.A. 185. That same individual did not want to be "forced into performing more work such as unloading, reloading and more driving due simply to the extension in the workday under the proposed changes." J.A. 185. The record also shows that individuals benefitting from an off-duty 30-minute rule thought the prior work pause was "necessary to reduce [their] fatigue[,]" and some reported that they would likely be pressured to do more work without it. J.A. 189. In sum, the Teamsters did not offer only unsubstantiated generalizations about the Final Rule's effect on its membership. It submitted survey responses evidencing the concrete injuries that individual members expected the rule would cause them to suffer.

To be sure, we do not know the names of the individuals in the survey, but anonymity is no barrier to standing on this record. *See NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 86 (D.C. Cir. 2012) (finding that anonymous plaintiff had standing). "Naming [union] members adds no essential information bearing on the injury component of standing." *Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499, 1506 (D.C. Cir. 1988) (Mikva, J., separate opinion); *see B.R. v. F.C.S.B.*, 17 F.4th 485, 493–494 (4th Cir. 2021) (finding Article III standing even though plaintiff was unnamed because "everything else about what she alleged was real" and "showed that she possessed the kind of 'personal stake' necessary for standing") (emphasis and citation omitted).[2]

The Administration also argues that the harms asserted by the Teamsters' members are "conjectural[,]" in that the Teamsters did not demonstrate that individual drivers would actually see a change in their working hours or miles driven, or that they would have decreased break time. Gov't Br. 27–28. But here the primary injury is an "allegedly illegal * * * rule under which [the drivers are] regulated." *Bonacci*, 909 F.3d at 1159 (citation omitted). And the drivers assert that the loss of government protection of a 12-hour workday for short-haul drivers and a 30-minute break for long-haul drivers will increase their physical fatigue. By the by, the Administration is ill-positioned to tout the increased flexibility and efficiencies that its new rules will provide when defending them on the

---

   [2] *See also National Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015) (noting that, "[w]here it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury, we see no purpose to be served by requiring an organization to identify by name the member or members injured").

merits and yet assume that nothing will change for drivers in its standing argument. *See* Final Rule, 85 Fed. Reg. at 33,418 (conceding that, under the Final Rule, a break "may" consist of "on duty/not-driving" work and breaks taken off-duty "may be less than 30 minutes in duration").

As for the second two prongs of the associational standing analysis, the Teamsters have likewise sufficiently demonstrated that the interests they seek to protect in this litigation are germane to their purpose of promoting safe and healthy working conditions for commercial truck drivers, and that neither the claims asserted nor the purely declaratory and injunctive relief sought requires individual members to participate in the lawsuit. *See* Byrd Declaration ¶ 2.

Because the Teamsters have established Article III standing, we have jurisdiction to address the petition for review.[3]

**III**

Highway Advocates claim that the final rule is arbitrary and capricious in several respects. *See* 5 U.S.C. § 706(2). Under the Administrative Procedure Act ("APA"), agency action must be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). In particular, we must ensure that the agency drew a "rational

---

[3] In light of our holding that the Teamsters have standing to raise each of the claims advanced by the group of petitioners, we need not address whether the other petitioners—Advocates for Highway and Auto Safety, Citizens for Reliable and Safe Highways, and Parents Against Tired Truckers—also have standing in their own right. *See Food & Water Watch v. FERC*, 28 F.4th 277, 284 (D.C. Cir. 2022) ("[W]hen multiple petitioners bring claims jointly, only one petitioner needs standing to raise each claim.") (citation omitted).

connection between the facts found and the choice made[,]" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (citation omitted), and that it "reasonably considered the relevant issues" and factors, particularly those expressly mandated by statute, *Prometheus Radio Project*, 141 S. Ct. at 1158; *see Public Citizen*, 374 F.3d at 1216.

While aspects of the Administration's analysis and reasoning leave much to be desired, at bottom, the Administration sufficiently explained and factually justified its conclusions that the new short-haul exemption and the 30-minute break requirement would not adversely affect safety, driver health, or regulatory compliance.

**A**

Highway Advocates level three challenges to the Administration's expansion of the short-haul exemption. First, they argue that the Administration failed to consider the collision risks of driving later in the now-lengthened workday. Second, they assert that the Administration failed to adequately justify its conclusion that the change would not adversely affect driver health. Third, they contend that the Administration did not reasonably explain its finding that the expansion would not affect drivers' compliance with the hours-of-service rules. Each of those arguments fails. The Administration reasonably weighed competing studies on collision risk to conclude that the Final Rule was safety neutral, addressed driver-health impacts, and appropriately relied on the self-limiting nature of short-haul operations in concluding that the new rules would not foster noncompliance.

18

**1**

With respect to collision risk, the Administration considered three different studies addressing whether an extended on-duty period would increase end-of-workday fatigue and, with it, the risk of accidents. The Administration analyzed those studies, explained the weight it assigned to each, and justified its judgments. That is the type of expert analysis that falls within the Administration's wheelhouse, and we defer to its evaluation of "competing bodies of scientific research." *National Ass'n of Mfrs. v. EPA*, 750 F.3d 921, 924 (D.C. Cir. 2014).

**a**

The Administration reasonably relied on a collision-rate study of concrete-mixer trucks that examined how crash rates changed after Congress increased from 12 to 14 hours the time concrete-mixer drivers could be on duty and still qualify for the short-haul exemption. *See* Final Rule, 85 Fed. Reg. at 33,446; *see also* Fixing America's Surface Transportation Act, Pub. L. No. 114-94, § 5521, 129 Stat. 1312, 1559 (2015) (codified at 49 U.S.C. § 31502(f)). In analyzing the data from that study, which included both short-haul and long-haul drivers, the Administration "focused on the time of day when crashes occurred" to evaluate whether the added hours to the workday would increase crash risk. Final Rule, 85 Fed. Reg. at 33,446. Based on the assumption that "most concrete mixer trucks are operated on a schedule with a workday that begins in the morning hours and ends in the evening hours," the agency concluded that accidents occurring between 5:00 p.m. and 11:59 p.m. would fall at the end of the 12- or 14-hour workday. *Id.* Looking at accident data, the Administration then found that the 14-hour on-duty period did not affect "the percentage of concrete mixers in crashes at later hours of the day * * *

close to their maximum hours for the day[.]" *Id.* In fact, the percentage of accidents within that timeframe declined over the years studied. *Id.*

The Administration noted too that the share of concrete-mixer trucks involved in crashes as a percentage of all large truck crashes did not increase in a statistically significant way in the two years after Congress expanded their short-haul exemption, when compared to the two years before the change. Final Rule, 85 Fed. Reg. at 33,446.

On those bases, the Administration found that the expanded exemption for short-haul drivers generally presented no safety risk. Final Rule, 85 Fed. Reg. at 33,446.

Highway Advocates voice several objections to the Administration's analysis of the concrete-mixer data, none of which succeeds.

First, they challenge the assumption that crashes occurring between 5:00 p.m. and 11:59 p.m. reflected the 12th through 14th hour of the concrete mixers' workday because concrete mixers have variable start times that range between 7:00 a.m. and 12:00 p.m. But that statistic is consistent with the assumption that most concrete-mixer operations begin in the morning hours and that the hours between 5:00 p.m. and 11:59 p.m. would capture the hours on the later side of a 14-hour shift. Agencies are entitled to make assumptions about facts within their area of expertise as long as they are reasonable, which this one is. *See New York v. Nuclear Regul. Comm'n*, 824 F.3d 1012, 1022 (D.C. Cir. 2016); *Minisink Residents for Env't Preservation & Safety v. FERC*, 762 F.3d 97, 112 (D.C. Cir. 2014) ("[W]e consistently decline to flyspeck an agency's * * * analysis.") (formatting modified and citation omitted).

Second, Highway Advocates challenge the data as overinclusive because it included both short-haul and long-haul drivers, and so the data lacked a "direct correlation to the short-haul population." Final Rule, 85 Fed. Reg. at 33,446.

Data confined to short-haul drivers would have been better. But the APA does not require that agencies make the perfect the enemy of the good. What matters is that the evidence used had probative relevance, and that the agency acknowledged its limitations when evaluating it. *See Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1052 (D.C. Cir. 2001) (per curiam) ("That a model is limited or imperfect is not, in itself, a reason to remand agency decisions based upon it.").

Here, the Administration acknowledged that the data was not "definitive" but explained that it was "the best available data with a before and after comparison of changes like" those made in the Final Rule, and it spoke directly to the question of whether driving later in a 14-hour duty day would affect crash rates. Final Rule, 85 Fed. Reg. at 33,446. That was reasonable enough.

Third, Highway Advocates critique the Administration for not comparing "the percentage of concrete mixers involved in crashes later in the day" to "trends within trucking operations in general." Highway Advocates Opening Br. 30. But the Highway Advocates themselves do not suggest that those trends would, in fact, cast doubt on the Administration's conclusion. In the absence of any argument that the proposed additional analysis would have affected the outcome, we defer to the Administration's decision to proceed "on the basis of imperfect scientific information[.]" *American Petroleum Inst. v. EPA*, 862 F.3d 50, 70 (D.C. Cir. 2017) (per curiam) (citation omitted). Highway Advocates' reproval of the

agency's failure to gather "information about whether the number of concrete mixers remained steady as a percentage of large trucks" (Opening Br. 30) fails for the same reason. Mere speculation about ways more information might alter the analysis—without any showing that the information was attainable and material—is not enough.

Fourth, Highway Advocates point to potential differences between concrete-mixer operations and typical short-haul trucking operations. In their view, typical short-haul truckers "may be more likely than concrete mixers to use the entire daily maximum duty period of 14 hours" or to "travel at increased speeds or log more highway miles than concrete trucks." Highway Advocates Opening Br. 31 (citation omitted).

Perhaps. But the Administration grappled with that issue. The Final Rule acknowledged that "the population of concrete mixers" may not be "representative of all short-haul operations." Final Rule, 85 Fed. Reg. at 33,446. Still, the Administration fairly reasoned that the study homed in on the exact change from 12 to 14 work hours that it was considering in its Final Rule. *Id.* It was "the best available data" of the "before and after comparison" the agency was studying. *Id.* The Administration thus sensibly weighed the pros and cons of the concrete-mixer study and provided a reasonable explanation for its reliance on that study. That suffices for arbitrary and capricious review since "[i]t is not infrequent that the available data does not settle a regulatory issue and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion." *State Farm*, 463 U.S. at 52.

**b**

Relatedly, Highway Advocates argue that the Administration did not provide adequate reasons for discounting two studies that, in their view, showed that enlarging the short-haul exemption to 14 on-duty hours would negatively affect safety.

First, Highway Advocates point to a study of 97 truck drivers between 2005 and 2007 performed by Myra Blanco and others at the Virginia Tech Transportation Institute. Final Rule, 85 Fed. Reg. at 33,412 (citing MYRA BLANCO ET AL., THE IMPACT OF DRIVING, NON-DRIVING WORK, AND REST BREAKS ON DRIVING PERFORMANCE IN COMMERCIAL MOTOR VEHICLE OPERATIONS (2011) ("Blanco study")). In particular, Highway Advocates object that the Administration failed to respond to the Blanco study's findings that "driving later in the workday had a negative safety effect." Highway Advocates Opening Br. 32.

The Administration, though, provided a reasonable explanation for discounting that aspect of the Blanco study. To start, the Final Rule candidly acknowledged that the "Blanco study showed that the [safety critical event] rate increased modestly with increasing work and driving hours." 85 Fed. Reg. at 33,445. But the Administration emphasized the Blanco study's simultaneous conclusion that "breaks can be used to counteract the negative effects of time on task." *Id.* In explaining why the 14-hour duty period would not have an adverse safety impact, the Administration found that, due to the nature of their work, "short-haul drivers have frequent breaks from driving throughout the day." *Id.* at 33,412.

Second, Highway Advocates challenge the Administration's rejection of a 2017 study of large trucks

operated in North Carolina by interstate carriers under the short-haul exemption. *See* Final Rule, 85 Fed. Reg. at 33,408 (citing Eric R. Teoh et al., *Crash Risk Factors for Interstate Large Trucks in North Carolina*, 62 J. SAFETY RSCH. 13 (2017)). The North Carolina study found that "interstate truck drivers operating under the short-haul exception had a crash risk 383 percent higher than those not using the exception." *Id.* at 33,446.

The Administration provided adequate reasons for giving the North Carolina study little weight. For one thing, the study was "based on a very small sample size" and was "not nationally representative." Final Rule, 85 Fed. Reg. at 33,446. In addition, the authors of the study acknowledged that other factors unobserved in the study may have led to the high crash rate, noting, for example, that "it is possible that older or more poorly maintained trucks are used in local operations." *Id.*

Given that each study had its upsides and downsides, the only question is whether the Administration acknowledged the weaknesses in the evidence on which it relied, reasonably explained how the evidence still supported the agency's conclusion, and addressed relevant contrary evidence. The Administration did just that, and arbitrary and capricious review requires no more.

**2**

Congress has mandated that the Administration consider "the physical condition" of drivers when regulating "the operation of commercial motor vehicles[.]" 49 U.S.C. § 31136(a)(3), (4). Highway Advocates argue that the Administration failed to adequately consider the impact on driver health of expanding duty hours for the short-haul

exemption. The record supports the Administration's contrary conclusion.

The Administration found that expanding the short-haul exemption would have two health benefits: decreased stress for drivers and a potential decrease in the number of stops that involve loading and unloading, where injuries commonly occur. Final Rule, 85 Fed. Reg. at 33,409, 33,447. The agency reasoned that, although the "[t]otal hours driven or worked could increase or decrease on a given day," it did "not anticipate that these time shifts [would] negatively impact drivers' health" in part because the increased flexibility would "empower drivers to make informed decisions"—like when to take a break to catch a nap or avoid a storm—"based on the current situation, and thus the rule could lead to a decrease in stress and subsequent health benefits." *Id.* at 33,447.

The Administration also predicted that expanding the short-haul exemption to include a 150-mile radius might induce carriers to "choose to serve new customers near the outer limit of the expanded" radius and, in that way, "draw down more of the 11-hour driving limit[,]" while making fewer deliveries than before. Final Rule, 85 Fed. Reg. 33,408. That, in turn, could "minimize, or even eliminate, an increase in the number of stops," which is where drivers' "workplace injuries typically occur" according to the Teamsters. *Id.* at 33,409; *see* J.A. 183 (Teamsters' Comment). The Administration elaborated that "[n]o data was provided to suggest that driving distance was directly related to injuries received by short-haul drivers[.]" *Id.* at 33,408. To the contrary, the Administration referenced "several citations" agreeing with the Teamsters that "most injuries suffered by short-haul drivers are experienced during non-driving tasks, such as loading and unloading." *Id.* That danger, the Administration added, could potentially be reduced

because the expansion would allow for longer runs with fewer loading and unloading stops.   *Id.*

Importantly, as the Final Rule "emphasize[d]," its changes to the short-haul exemption "allow neither additional drive time during the workday, nor driving after the 14th hour from the beginning of the workday."   85 Fed. Reg. at 33,405. Before the Final Rule, drivers were already allowed to work up to 14 hours a day, as long as they did not drive more than 11 hours in that time period.   2011 Rule, 76 Fed. Reg. at 81,134. So whether drivers spend their time traveling shorter distances with frequent stops or longer distances with fewer stops, they are still protected by the same maximum driving and work hours.

All the Final Rule did was expand the exemption from electronic recordkeeping requirements to cover a greater number of drivers.   As the Administration explained: "Services may now be provided more efficiently (*i.e.*, not incurring the costs of preparing [records of duty status] and retaining supporting documents for the days drivers did not satisfy the short-haul limits) without compromising safety." 85 Fed. Reg. at 33,405.

That said, the Administration acknowledged that, under the Final Rule, "[t]otal hours driven or worked could increase or decrease on a given day[.]"   Final Rule, 85 Fed. Reg. at 33,447; *see also id.* at 33,397 ("None of the provisions in this final rule will increase the maximum allowable driving time, but may result in changes to the number of hours driven, or hours worked during a given work shift[,]" as compared to drivers' experience prior to the Final Rule).   The agency did not provide any more detailed prediction on how much non-driving, working hours might increase.

The agency's other estimates do not directly address the extent of the potential increase either. The Administration "estimat[ed]" that there would be no "significant change in the number of drivers or motor carriers operating under the short-haul exception[.]" Final Rule, 85 Fed. Reg. at 33,409. It came to that conclusion based on "the comments * * * and the previous short-haul exception requests" it had received. *Id.* But the fact that there would be only a limited number of drivers qualifying under the exemption (because they previously worked more than 12 hours or drove more than 100 miles) says little about how drivers operating under the short-haul exemption will be affected. The agency also estimated that there would be "[m]inim[al] or no change to hours *driven* or aggregate [vehicle miles traveled]." *Id.* at 33,398 (emphasis added). That conclusion is reasonable given that the Final Rule did not change the 11-hour limit on driving time. But again, this point does not address the issue of whether drivers currently operating under the short-haul exemption will now *work* more than 12 hours.

Nevertheless, the Administration ultimately got to the right place by addressing directly the health impact on drivers who previously operated within a 12-hour duty window but would now face a 14-hour one. The Administration stressed that long-haul drivers have for almost two decades been able to work a 14-hour duty day, a limit that sufficiently protected driver health. Final Rule, 85 Fed. Reg. at 33,403, 33,408; *see* 2005 Rule, 70 Fed. Reg. at 49,978–49,980; *Owner-Operator Indep. Drivers Ass'n*, 494 F.3d at 209 (denying petition challenging 14-hour limit). The Administration reasoned that the 14-hour duty window was "consistent with the statutory obligation to protect driver safety and health * * * as shown by the extensive discussion in the 2005 final rule[.]" Final Rule, 85 Fed. Reg. at 33,403. The Administration here appropriately relied on the reasoning and findings of that

earlier rule and its ensuing experience with the 14-hour duty day.

Even more on point, the 2005 Rule made a series of specific findings showing that a 14-hour on-duty period was not detrimental to driver health. That rule concluded that a 10-hour off-duty period resulted in about 6.28 hours of sleep per night, which was "within normal ranges consistent with a healthy lifestyle[.]" 2005 Rule, 70 Fed. Reg. at 49,983. The Administration also found that "noise levels in [commercial motor vehicles] should not result in significant hearing loss over a lifetime of on-the-job exposure, even if drivers drove the maximum [14 hours]." *Id.* at 49,987. Likewise, the Administration found that "long hours alone" do not "adversely affect worker health[,]" and so a 14-hour duty period would not "have any negative impact on driver health." *Id.* at 49,990.

The 2005 Rule did not, as the Highway Advocates claim, hinge its reasoning solely on the fact that the 14-hour duty period it imposed was shorter than the previous duty period allowed under the hours-of-service rules. In fact, for non-commercially licensed short-haul drivers, the 2005 Rule increased work hours. 70 Fed. Reg. at 50,033.

The Highway Advocates level three challenges to the agency's analysis.

First, Highway Advocates argue that the Administration failed to establish that safety outcomes for those who work 14 hours a day are equivalent to those for drivers working only 12 hours a day. But the Administration reasonably based its finding that the shift from 12 to 14 hours of duty for some drivers was "health-neutral" by considering the health benefit of decreased stress and experience showing the lack of an

adverse health impact from a 14-hour duty day for long-haul drivers. Final Rule, 85 Fed. Reg. at 33,403, 33,447.

Second, Highway Advocates assert that the Administration failed to consider relevant distinctions between short-haul and long-haul operations that it had acknowledged elsewhere. *See, e.g.*, Final Rule, 85 Fed. Reg. at 33,408 (Short-haul operations involve "frequent delivery stops[.]"). For example, "most long-haul drivers do not load or unload the cargo[,]" and they often make long runs at night. 2011 Rule, 76 Fed. Reg. at 81,141. By contrast, "the inherent nature of short-haul operations" is that they involve "several stops for pick-up and/or delivery during the shift, or a few trips with extended periods at the delivery/service site[.]" Final Rule, 85 Fed. Reg. at 33,407. In the Highway Advocates' view, the Administration did not address the important problem that the "unique context of short-haul operations" might lead to different driver health outcomes during an extended workday. Highway Advocates Opening Br. 36 (citation omitted). By the same token, the Teamsters suggest that loading and unloading operations are in fact likely to lead to injuries, including lower back pain. *See* 85 Fed. Reg. at 33,408–33,409.

The Administration's reasoning, however, took cognizance of the unique features of short-haul operations. The Final Rule found that short-haul drivers often felt pressure to "beat the clock" and return to their work base on time. 85 Fed. Reg. at 33,406. This consideration underlay the Administration's finding that the Final Rule could benefit driver health by increasing "flexibility" to take breaks when needed and safe to do so, and by decreasing stress. *Id.* at 33,404, 33,447. Along with that, the Administration's analysis of the safety of the 2005 Rule's 14-hour on-duty limit expressly covered both short-haul and long-haul drivers. *See*

2005 Rule, 70 Fed. Reg. at 50,033. And the Administration's conclusion that there are many factors associated with lower-back pain—"age, postures, lifting, smoking, falls, job satisfaction, and body condition, including weight"—continue to support its conclusion that a 14-hour on-duty day sufficiently protects driver health. *Id.* at 49,988.

Indeed, since some short-haul drivers were already covered by the 14-hour duty day from the 2005 Rule, all the Final Rule did was release more short-haul drivers from electronic recordkeeping requirements. The Administration reasonably found that paperwork change to be health neutral on the question of the impact of the 14-hour day.

Third, Highway Advocates argue that the Administration failed to consider a National Institute for Occupational Safety and Health report submitted by the Teamsters. The report "examine[d] the associations between long working hours and illnesses, injuries, health behaviors, and performance[,]" and it found that a "pattern of deteriorating performance on psychophysiological tests as well as injuries while working long hours was observed across study findings, particularly with very long shifts and when 12-hour shifts combined with more than 40 hours of work a week." CLAIRE C. CARUSO ET AL., NATIONAL INST. OF OCCUPATIONAL SAFETY & HEALTH, OVERTIME AND EXTENDED WORK SHIFTS: RECENT FINDINGS ON ILLNESSES, INJURIES, AND HEALTH BEHAVIORS at iv (2004), https://www.cdc.gov/niosh/docs/2004-143/pdfs/2004-143.pdf (last accessed July 18, 2022).

The Administration, however, sufficiently addressed this report. It explained that the Teamsters had not provided "any study * * * showing workplace injuries [increasing] as a function of each hour worked." Final Rule, 85 Fed. Reg. at 33,409. Even Highway Advocates concede that there is a

"lack of evidence" in the record "about the precise effect of extending the workday[.]"   Highway Advocates Reply Br. 15. The Final Rule also cited the Administration's prior analysis in the 2005 Rule, which addressed the effect of long work hours on driver health and cited to this same study.   Final Rule, 85 Fed. Reg. at 33,403; 2005 Rule, 70 Fed. Reg. at 49,989. There, the Administration pointed out that the National Institute for Occupational Safety and Health study candidly acknowledged that "research questions remain about the ways overtime and extended work shifts influence health and safety[,]" and that "identifying differences between 8-hour and 12-hour shifts is difficult because of the inconsistencies in the types of work schedules examined across studies."   70 Fed. Reg. at 49,990 (formatting modified and citations omitted).

Given those uncertainties, the Administration grounded its analysis in consideration of all the driver health studies put before it.   From them, it determined that "[n]o research studies were found that permitted an examination of whether additional hours of driving or non-driving time would impact driver health[,]" and "[r]esearch on other occupations is mixed and does not show conclusively that long hours alone adversely affect worker health."   2005 Rule, 70 Fed. Reg. at 49,990. Because the Administration's concerns about the study from 2005 continued to hold true at the time of the Final Rule, the Administration adequately addressed the National Institute's study.

At bottom, the Administration's finding of no adverse health effect involved a reasonable weighing of many factors, including empirical studies and on-the-ground experience in related areas.   While the Administration's reasoning was underwhelming in certain respects, it gets across the arbitrary and capricious line.

**3**

Highway Advocates next argue that the Administration inadequately explained why reducing the number of drivers that must keep duty records or use electronic logging devices would not impact compliance with hours-of-service regulations, and so harm safety enforcement. While the Administration's decision passes arbitrary-and-capricious muster, it is only by a narrow margin.

Highway Advocates rightly point out that the purpose of electronic logging devices is to improve compliance with the hours-of-service rules. 49 U.S.C. § 31137(a); Electronic Logging Devices, 80 Fed. Reg. at 78,292. And remember that, before the Final Rule, if short-haul drivers wished to qualify for the recordkeeping exemption, they were constrained to 12 hours of on-duty time in which to drive a maximum of 11 hours. Now, short-haul drivers have 14 hours of on-duty time and can travel within a 150 -mile radius to drive a maximum of 11 hours. Nevertheless, the Administration specifically found that expanding the recordkeeping exemption would not "foster noncompliance with the underlying" hours-of-service requirements. Final Rule, 85 Fed. Reg. at 33,406.

That conclusion was a sharp reversal of course for the Administration. It had previously found that electronic logging devices "make it more difficult for individuals who currently do not routinely achieve high levels of compliance with the [hours-of-service] rules to produce inaccurate records." Electronic Logging Devices, 80 Fed. Reg. at 78,306. In addition, the Administration had previously concluded that there was a compliance problem in the offing. In 1987, the agency stated that "an extension beyond 12 consecutive hours would increase the likelihood that drivers would be able to exceed the 10-hour driving limitation without

detection." Hours of Service of Drivers, 52 Fed. Reg. 41,718, 41,719 (Oct. 30, 1987); *see also* Hours of Service of Drivers, 45 Fed. Reg. at 22,043 ("[S]ince [the Federal Highway Administration] is expanding the area of operation fourfold [from a 50-mile radius to a 100-mile radius], a limitation is necessary to ensure that the hours of service are not violated.").

When an agency changes position, it must "'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009)). That is required not because "the mere fact of policy change" is a problem, but rather because agencies must reasonably explain why "facts and circumstances that underlay or were engendered by the prior policy" are now being cast aside. *Id.* at 222 (citation omitted).

The Administration explained its change and acknowledged its earlier finding that electronic logging devices increase compliance. Final Rule, 85 Fed. Reg. at 33,407. The agency also admitted that the Final Rule's change could create "monitoring compliance and enforcement challenges under the short-haul provision." *Id.* at 33,406.

The Administration nevertheless gave a sufficient explanation for its new conclusion that expanding the recordkeeping exemption will not "increase the opportunities to falsify time records." 85 Fed. Reg. at 33,406. While recognizing that drivers would leverage some of the additional two duty hours "to spend time with customers[] [and] respond to changes in market demand[,]" the Administration also predicted that the additional time would not be fully used for non-driving work. *Id.* The additional time in which to drive the same 11 hours as before "remove[s] pressure [on] short-

haul drivers to 'beat the clock'" of the previous 12-hour duty limit, thereby making compliance more attainable as a practical matter. *Id.*

The Administration also reasoned that the change would bring the short-haul exemption into line with the 14-hour workday limit for the long-haul and non-commercially licensed short-haul drivers, which would "simplify enforcement" of the regulations both by the motor carriers supervising their drivers and by other enforcement personnel. 85 Fed. Reg. at 33,409–33,410. The Administration, in other words, reasoned that its changes would not increase noncompliance because simpler, more flexible rules are more easily followed and effectively enforced.

The Administration next pointed out that "short-haul operations are essentially self-limiting because of the nature of the operations and requirement to return to the reporting location" daily. 85 Fed. Reg. at 33,408. The agency concluded that increasing the workday to 14 hours would not affect those inherent constraints on noncompliant overworking because short-haul drivers "rarely approach the 11-hour driving limit." *Id.* at 33,408. The Administration added that "[s]hort-haul drivers do not have the opportunity to pause the 14-hour clock while drivers are loading and unloading[.]" *Id.* at 33,407. Also, because drivers must return to their reporting location, "[s]afety investigators" can continue to "examine time cards and other [hours of service] records during compliance investigations" and so can effectively monitor the 14-hour time limit. *Id.* In the agency's view, therefore, the 12-hour on-duty limit was simply unnecessary to enforce the 11-hour driving limit.

Finally, the agency predicted that "the decrease in the number of carriers using [electronic logging devices] [would]

be limited because the change impacts only the [commercially licensed drivers] who currently travel between 100 and 150 * * * miles from the normal work reporting location and return to that location within 12 to 14 hours each day." 85 Fed. Reg. at 33,407; *see also id.* at 33,409 (cross-referencing Regulatory Impact Analysis for discussion of estimate). To arrive at that conclusion, the Administration reviewed requests for an exemption from the prior hour limit it had received between 2015 and 2019, as well as comments about driver practices under existing exemptions. *See* FEDERAL MOTOR CARRIER SAFETY ADMIN., REGUL. EVALUATION OF THE 2020 HOURS OF SERVICE FINAL RULE 23–24 (Feb. 2020), https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/2020-06/HOS%20RIA.PDF (last accessed July 18, 2022).

Given the deference afforded to the Administration and our narrow standard of review, those observations met the APA threshold of a sufficient explanation for why neither electronic logging devices nor a 12-hour workday limit were necessary to achieve equivalent compliance.

In so ruling, we expressly do not rely on some other reasons advanced by the Administration. For example, the Administration said that electronic logging devices are not cost-effective for short-haul drivers. While this point may help address why some level of increased noncompliance is outweighed by other benefits, it says nothing about why the Final Rule will not harm compliance or increase opportunities to falsify records.

The agency's explanation that "the techniques currently used to enforce the [hours-of-service] requirements for short-haul drivers will be the same whether the maximum work shift is 12 or 14 hours" also misses the mark. Final Rule, 85 Fed. Reg. 33,406. By taking as its reference point the current

short-haul exemption's enforcement techniques, without establishing equivalency between those techniques and the automated enforcement provided by electronic logging, the Administration failed to address the fact that its rule increases the pool of drivers exempted from its more effective enforcement mechanism. That rationale also forgets the Administration's prior factual finding that a 12-hour duty window was a more effective measure for enforcing a 10-hour driving limit than a 15-hour duty window. *See* Hours of Service of Drivers, 45 Fed. Reg. at 22,043; *see also* Hours of Service of Drivers, 52 Fed. Reg. at 41,719.

Having said that, what matters is that the Administration gave an adequate and record-based explanation for its abandonment of its prior positions and its adoption of a new approach. That suffices for our limited review.

**B**

The Highway Advocates separately challenge the Final Rule's changes to the 30-minute break requirement for property-carrying commercial motor carriers. They object specifically to (i) the change from rest-required breaks to just having non-driving work intervals, and (ii) the new requirement that drivers take the break after 8 hours of driving, rather than 8 hours of working. The Highway Advocates claim that, in adopting these changes, the Administration insufficiently accounted for the cumulative fatigue engendered by non-driving tasks over the course of a 14-hour workday, and failed to explain how the modifications are neutral as to driver health. The Final Rule survives arbitrary and capricious review here as well.

**1**

**a**

On the question of driver fatigue over a 14-hour workday, the Administration relied primarily on the 2011 Blanco study to find that permitting drivers to engage in non-driving work during mandatory 30-minute breaks would be safety neutral. Certainly a "key take-away" of the Blanco study was that "driving time occurring later in the driver's workday due to performing non-driving tasks earlier in the workday[] has a negative safety effect." J.A. 22. The Blanco study noted that the "time-on-task effect" captured in the data when driving occurred later in the workday "may be the result of the inclusion of non-driving work (in addition to the driving work) which represented a considerable portion of the [commercial motor vehicle] drivers' workday[.]" J.A. 25.

But central to the Administration's decision here was the Blanco study's other critical finding: "When non-driving activities (both work- and rest-related) were introduced during the driver's shift—creating a break from the driving task[,]" the "risk of being involved in a[] [safety critical event] during the 1-hour window after the break" was "significantly reduced[.]" J.A. 25.

The Administration acknowledged that when it first imposed a 30-minute off-duty, no-work-allowed break in 2011, it had relied on the Blanco study's finding "that off-duty breaks resulted in a greater decrease in subsequent safety critical events * * * than on-duty breaks." J.A. 214. But after looking more closely at what kind of breaks the Blanco study considered to be "on-duty" or "off-duty," the Administration in 2020 found that there was less of a difference in the benefit than it had originally assumed. Final Rule, 85 Fed. Reg. at

33,412, 33,416–33,417. Specifically, the Blanco study categorized time spent "rest[ing] during [the] duty period[,]" perhaps eating or sleeping in the cab of a truck, as an "on-duty" break. J.A. 214–215 (formatting modified). Yet the Administration considered that kind of break an "off-duty" break. Once that type of break was added to the Blanco study's "off-duty" category, the Administration noticed no statistically significant difference in the reduction of safety critical events in the hours after a break from all work and a break only from driving. On that basis, the Administration decided that on- and off-duty breaks reduced safety critical events throughout 14-hour workdays to the same degree.

The Administration also pointed to collision data from the operation of certain hazardous material vehicles that, for seven years, had allowed on-duty time to satisfy its 30-minute break requirement. Analyzing data two years before and after that exemption from the 30-minute off-duty break requirement, the agency did "not discover[] evidence of adverse safety impacts[.]" J.A. 217.[4]

---

[4] Highway Advocates argue that the Administration cannot rely on the hazardous material vehicle data because "it did not refer to the Regulatory Impact Analysis's discussion of those exemptions." Highway Advocates Reply Br. 24. However, the Final Rule generally incorporated the "synthesis of research conducted specific to current [hours of service] practices, stakeholder comments, and analysis of the impacts resulting from changes to the [hours of service] provisions" in the Regulatory Impact Analysis. Final Rule, 85 Fed. Reg. at 33,438. On top of that, the Administration expressly referenced that Regulatory Impact Analysis for its change to the 30-minute break rule. Id. at 33,445 ("As discussed above and in the [Regulatory Impact Analysis] * * * [the agency] anticipates that an on-duty break from driving[] will not adversely affect safety relative to the previous requirements.").

Highway Advocates argue that this data was of diminished relevance because, for those hazardous material operations, agency regulations "require driver attendance [with the cargo] when transporting [certain] hazardous cargo[,]" even while the vehicle is stopped, "without [doing] other work[.]"   Final Rule, 85 Fed. Reg. at 33,417; *accord* J.A. 216.   So in the Highway Advocates' view, the breaks taken by hazardous material operators to fulfill their 30-minute break requirement are not comparable to the kinds of on-duty breaks that other commercial drivers might take.[5]

The Administration was forthright about the nature of the hazardous material drivers' "on-duty not driving time[,]" J.A. 216 & n.52.   And it acknowledged that hazardous-material drivers' breaks did not perfectly line up with the on-duty, non-driving breaks that would now be allowed for other drivers, which could include bathroom and food breaks, "loading or unloading a truck, completing paperwork, or stopping for fuel." Final Rule, 85 Fed. Reg. at 33,436.   Having recognized the limitations of the data, the Administration's takeaway that it still had "not discovered evidence of adverse safety impacts" from on-duty break periods, J.A. 217, remained a plausible assessment given the information before it.   And even if this study would not have been sufficient to support the

---

[5]   Some, but not all, of the exemptions allowed drivers "to count up to 30 minutes of their on-duty attendance time toward a required rest break" only "if they perform no other on-duty activities during the rest-break period."   Hours of Service of Drivers: Application for Exemption; American Trucking Ass'ns, Inc., 80 Fed. Reg. 50,912, 50,913 (Aug. 21, 2015); *compare id.*, *with* Hours of Service of Drivers:   National Tank Truck Carriers and Massachusetts Motor Transportation Association; Application for Exemption, 83 Fed. Reg. 15,221 (April 9, 2018) (granting exemption without such limitation).

Administration's conclusion alone, it bolstered the Administration's reliance on the reevaluated Blanco study.

The Administration further reasoned that dispensing with the 30-minute non-working break would increase safety by reducing the operators' incentive to drive "more aggressively" at the end of their shift to stay within their work-hour limits and avoid the downtime of the break requirement.  Final Rule, 85 Fed. Reg. at 33,416.  In the agency's view, "the 30-minute off-duty break generates pressure as drivers attempt to keep on schedule."  *Id.*

Given the record as a whole, the Administration sufficiently justified its conclusion that both on-duty and off-duty breaks taken before more than 8 hours of driving elapse provide a sufficiently equivalent reset to keep drivers safe and alert.

Still, in Highway Advocates' view, the Administration failed to address the cumulative fatigue that arises when drivers work a 14-hour day with only working breaks from driving and no off-duty time to rest.  The new rule, they explain, effectively increases the long-haul driver's already long work-duty day by an additional 30 minutes.

The Administration did in fact address the cumulative effects of fatigue.  To start, it concluded that drivers would not commonly work the full 14 hours.  It found that, for ten trucking companies operating between 2013 and 2016, only 4% of shifts ran over 13.5 hours.  Final Rule, 85 Fed. Reg. at 33,419.  The agency explained that the change to the 30-minute break "would affect only the amount of work performed in shifts taking more than 13.5 hours to complete."  *Id.*  In other words, before the rule change, drivers could have worked a maximum of 13.5 hours in a shift—the 30-minute break

would round out the rest of the 14 hours—and yet few were doing so. That suggested to the Administration that drivers are not being pushed to work every available minute, and the same would be true under the new system.

Plus, even the small percentage of 14-hour days would be whittled down further, the Administration explained, because the change to the 30-minute break requirement would "not significantly decrease the number of breaks being taken by drivers." Final Rule, 85 Fed. Reg. at 33,418. The agency based this estimation "on the feedback provided during the public listening sessions and the written comments provided by individuals identifying themselves as drivers[.]" *Id.* To be sure, some drivers voiced the contrary view. But balancing conflicting evidence is the agency's job, not ours, as long as the agency reasonably weighs evidence both supporting and undermining its final conclusion. *See National Ass'n of Regul. Utility Comm'rs v. FCC*, 737 F.2d 1095, 1124 (D.C. Cir. 1984) ("A degree of agency reliance on [comments from affected parties] is not only permissible but often unavoidable."); *accord American Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 516 (D.C. Cir. 2020).

**b**

Relatedly, the Highway Advocates argue that the Administration failed to explain how allowing on-duty breaks only after 8 hours of driving could be safety neutral for long-haul operators that drive 8 hours or fewer within a 14-hour workday. Under the Final Rule, the new 30-minute break requirement would not trigger at any point within the 14-hour duty period for those who drive fewer than 8 hours in the day. 85 Fed. Reg. at 33,396. That means that a driver could conduct strenuous "on-duty non-driving work for [8] hours straight without any break[,] and then get behind the wheel of

an 80,000-pound [commercial motor vehicle] and drive for [6] hours" straight.   J.A. 282.

The Administration acknowledged that this could happen, but it believed that such drivers were "unlikely to accumulate the levels of fatigue necessitating a mandatory 30-minute break" because of breaks that "naturally occur during their workday."   Final Rule, 85 Fed. Reg. at 33,418.   The Administration pointed to comments indicating that "routine[]" stops, such as food and restroom stops, would continue.   *Id.* The Final Rule then specifically considered whether drivers who drove fewer than 8 hours would still take such routine breaks.   *Id.* at 33,419.   The Administration noted that comment responses "were almost equally split" between those who said they would take a break with fewer than 8 hours of driving and those that would not.   *Id.*   Considering those comments as well as the likelihood of loading and unloading stops, the agency reasonably predicted that "most drivers who drive for fewer than 8 hours" would continue to have "naturally occurring breaks * * * during the workday."   *Id.*

In short, the Administration reasonably explained why the new rule was safety neutral by considering both the safety benefit of decreased pressure to drive aggressively and the prospect of maintaining a roughly equivalent number of breaks as before the rule change.

**2**

Highway Advocates separately argue that, in modifying the 30-minute break requirement to allow working breaks, the Administration failed to adequately consider the impact on driver health of increased daily and weekly duty time.   We find no such error.

The Final Rule specifically considered driver health and concluded that the added break flexibility would potentially decrease stress for drivers. 85 Fed. Reg. at 33,447. More specifically, the Administration anticipated that the Final Rule would "empower drivers to make informed decisions" about the timing and location of breaks "based on the current situation, and thus the rule could lead to a decrease in stress and subsequent health benefits." *Id.*

Highway Advocates point out that, in 2011, the Administration estimated that the 30-minute off-duty break requirement "alone" would reap $94 million in health benefits. J.A. 35. In calculating that dollar figure, the agency "assumed the 30-minute break provision [would] provide benefits only by reducing cumulative on-duty hours and limiting the chances for long driving days; no additional benefits [were] counted for the refreshing or 'resetting' effect breaks are often thought to have on drivers who have grown fatigued during the course of a long, continuous drive." J.A. 33. "[L]ong work hours[,]" the Administration explained, "are often linked to insufficient sleep, obesity, and cardiovascular disease." J.A. 32.

To be sure, the Final Rule failed to directly address the dollars-and-cents health benefit associated with the 30-minute non-work break. But the Administration justified its conclusion that driver health would not be adversely impacted because "the rule provides greater flexibility for drivers to take breaks from the driving tasks and greater flexibility to obtain recuperative sleep[.]" Final Rule, 85 Fed. Reg. at 33,397. In other words, because drivers now have 30 more minutes to adjust to unexpected "weather, traffic, [and] detention times," they can "take breaks without penalty when they need rest." *Id.* In addition, drivers could gain more restorative sleep because the elimination of the 30-minute off-duty break could

"allow drivers to reach their destination earlier." *Id.* at 33,398.

The Administration added that, while "[t]otal hours driven or worked could increase or decrease on a given day," it did "not anticipate that these time shifts [would] negatively impact drivers' health." Final Rule, 85 Fed. Reg. at 33,447. This explanation fits neatly with the agency's prior determination that only approximately 4% of all shifts were susceptible to being lengthened by the rule change. *Id.* at 33,419; *see also id*. at 33,397–33,398. And any health effect would be further diminished because drivers are likely to continue to take routine off-duty breaks. *Id.* at 33,418.

In short, the Administration not only directly tackled the issue of driver health, but also reasonably explained why the health benefits estimated in the 2011 Rule would continue under the modified 30-minute break rule. That met the APA's requirements.

**IV**

For all those reasons, we deny the petition for review.

*So ordered.*